*471 OPINION OF THE COURT
Catherine Cholakis, J.
Before the court are two neglect petitions filed by the Rensselaer County Department of Social Services (petitioner) against respondents John and Jane Doe, fictitious names for the unknown biological parents of the subject child known as Baby Jack Doe. Baby Jack was left at St. Mary’s Hospital in Troy on November 20, 2008. Service of the petitions was effected by publication pursuant to an order to show cause of this court dated January 5, 2009. Respondents have not appeared to answer the petitions. An inquest was held on March 18, 2009 at which petitioner presented its case.
The record discloses that on November 20, 2008 an unidentified individual telephoned St. Mary’s Hospital and inquired as to whether the hospital was a “Safe Haven.” The caller was told that it was. Later that night a woman appeared at the hospital and handed over a baby boy. While the child was wrapped in clothing suitable for a two year old, he appeared to be a full term, newborn baby boy. The baby was in good health and estimated to be three to five hours old, as his umbilicus had not yet started to scab over. Additionally, staff surmised the baby was not born in a hospital as there was no sign the umbilicus had been clamped. The woman did not provide any additional information.
A day or two later, the hospital received a call from a woman who identified herself as Amber M., who said she was the sister of the baby’s mother. Ms. M. inquired after the baby’s condition. She also said that she might be interested in seeking custody of the child and left her telephone number.
After obtaining this information from the hospital, Darce Lemner Primo, a foster care supervisor with the Department of Social Services (DSS), placed a call to Ms. M. Ms. Primo learned that Ms. M. was not the woman who had brought the child to the hospital, but was his maternal aunt. While Ms. M. did not provide more specific information, she did state that the baby’s mother was a college student. Though Ms. M. did not live with her sister, she said she “had a feeling” who the child’s father was. Ms. M. confirmed to Ms. Primo that she had earlier expressed an interest in obtaining custody of the child, but said that she had changed her mind because she wanted “to honor [her] sister’s wishes.”
On November 24, 2008, Cara Chesley, a child protective services supervisor with DSS, verified the present neglect petitions *472 against respondents. On November 25, 2008, this court issued an order to show cause based upon the petitions. The order granted the interim relief of a temporary placement of Baby Jack with petitioner. While the petitions recited the basic facts surrounding the delivery of Baby Jack to St. Mary’s Hospital, they made no mention of Ms. M. nor of the information she had imparted to the hospital and to petitioner. On January 5, 2009, the court also authorized service of the petitions by publication.
The petitions allege neglect of Baby Jack as a child “under eighteen years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent ... to exercise a minimum degree of care in supplying the child with adequate food, clothing and shelter.” The petitions also recite the fact of Baby Jack having been left at St. Mary’s Hospital under the “Safe Haven” program (Abandoned Infant Protection Act) as the sole ground for a finding of neglect. The central question in this case is thus whether the surrender of a newborn to a “Safe Haven” in and of itself constitutes child neglect as pleaded in the petitions under Family Court Act § 1012 (f) (i) (A).
New York’s Abandoned Infant Protection Act (L 2000, ch 156, codified at Social Services Law § 372-g; Penal Law §§ 260.03, 260.15), also known as the “Safe Haven Law,” was enacted in response to the recognition of the growing problem of neonaticide (see Pollet, Safe Haven Laws — Do Legal Havens to Abandon Babies Save Lives?, 32 Westchester BJ 71 [2005]). The Act has two components: it amends the Penal Law by creating affirmative defenses to child endangerment and abandonment charges where an infant has been left at a “Safe Haven” location, and it amends the Social Services Law by mandating the development of a public information program “to inform the general public of the provisions of the abandoned infant protection act.” (Social. Services Law § 372-g.) As part of this statutorily mandated public information program, the New York State Office of Children and Family Services advertises: “Under the Abandoned Infant Protection Act, parents . . . who are unable to care for their newborn infants may anonymously and safely leave their infant in the care of a responsible person at a hospital ... or ... at another safe location” (http://www.ocfs.state.ny.us/main/safe/ info.asp [accessed July 28, 2009]).
Clearly, then, the intent of the Abandoned Infant Protection Act to reduce the incidence of neonaticide is being advanced on two fronts. First, there is the de facto limited “decriminaliza *473 tion” of child abandonment when the child is a newborn who has been brought to a designated “Safe Haven.” In addition, the public information campaign mandated by the Legislature now promotes the “Safe Haven” as an option to parents who are unable to care for their newborn infants.
Petitioner’s position in the present litigation suggests that the mere fact that an infant has been left at a “Safe Haven” is prima facie evidence of neglect under clause (A) of Family Court Act § 1012 (f) (i). This would seem to be at odds with the message currently being delivered by the Office of Children and Family Services. The inference to be drawn from petitioner’s argument is clear, however: new parents unable to care for their infants are provided with the legally approved (if not actively encouraged) option of delivering the child to a “Safe Haven”; at the same time, however, availing oneself of that option is tantamount to a failure to exercise a minimum degree of care. This position is untenable.
Neglect of a child under the specific clause pleaded in the petitions is established upon a showing that a parent has failed to exercise a minimum degree of care in, among other things, supplying the child with adequate food, clothing and shelter (see e.g. Matter of Mariah CC., 302 AD2d 799, 800 [3d Dept 2003], and cases cited therein). In the present case, the only relevant facts alleged in the petitions (and the only facts proved at the inquest) were those establishing that Baby Jack was delivered to a “Safe Haven” hospital as a newborn in good physical condition. Petitioner has not shouldered its burden of proving any failure on the part of the child’s parents in supplying the child with basic necessities or in providing adequate guardianship and supervision. To the contrary, it would seem that the child’s mother not only took steps to see to it that the baby was brought to a place where his immediate basic needs would be met, but she also followed up (albeit through her sister) to confirm that the child was safe and well. None of this constitutes proof of neglect on the part of either of the parents. In fact, the record is silent as to whether the child’s father was even aware of anything having to do with his son, including the fact of the child’s very existence. This hardly constitutes proof that the father neglected the child (cf. Matter of Mariah CC. at 800, citing Family Ct Act § 1046 [b] [finding of neglect must be established by preponderance of evidence]).
Petitioner has chosen not to plead that either or both parents have neglected the child by having abandoned him (see Family *474 Ct Act § 1012 [f| [ii]). That particular paragraph defines a “neglected child” as one “who has been abandoned, in accordance with the definition and other criteria set forth in subdivision five of section three hundred eighty-four-b of the social services law, by his parents or other person legally responsible for his care.” (Id.)
In turn, Social Services Law § 384-b (5) (a) states, in pertinent part:
“a child is ‘abandoned’ by his parent if such parent evinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from doing so by the agency. In the absence of evidence to the contrary, such ability to visit and communicate shall be presumed.”
Ordinarily, the passage of six months would be required prior to the filing of a petition seeking an order committing the guardianship and custody of an abandoned child to petitioner (see Social Services Law § 384-b [4] [b]). In 2005, however, the Legislature amended the definition of “aggravated circumstances” in Family Court Act § 1012 (j) to include cases “where a court has determined a child five days old or younger was abandoned by a parent with an intent to wholly abandon such child and with the intent that the child be safe from physical injury and cared for in an appropriate manner” (L 2005, ch 3, part B, § 3).
This amendment is critical, in that a finding of aggravated circumstances obviates the necessity of reasonable efforts to make it possible to return the child to his parents (see Family Ct Act § 1039-b [b] [1]). In short, this permits “fast-tracking” of a permanency hearing and allows for the expeditious filing of a termination of parental rights petition (see id. subd [c]), thereby promptly freeing the child for adoption.
It would seem, then, that the facts of this case would fit squarely under neglect as defined in Family Court Act § 1012 (f) (ii). Moreover, the surrender of the child to a “Safe Haven” would support a finding of aggravated circumstances under subdivision (j). Inasmuch as the present petitions do not allege this theory of neglect and as the facts adduced at the inquest do not support a finding of neglect under the theories that were advanced, however, the petitions must be dismissed with leave to replead.
*475 Accordingly, for the reasons stated above, it is ordered that the petition is dismissed, with leave to replead; and it is further ordered that the temporary placement of Jack Doe writh petitioner is continued until further order of the court.